UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No. |
| CHRISTINE LEE LOPEZ | ) | 13-22220 HRT |
| | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |

**ORDER DENYING OBJECTION TO CHAPTER 13 PLAN**

THIS MATTER comes before the Court on the Debtor's Amended Chapter 13 Plan (docket #21) and the Amended Objection (docket #29) thereto filed by Centre Point Station Condominium Association ("COA"). An evidentiary hearing was held on December 12, 2013, at the conclusion of which the Court took the matter under advisement. The Court is now ready to rule.[1]

I. Background

The parties have stipulated to the relevant facts. Debtor filed for Chapter 13 on July 17, 2013. Her principal residence, located at 4600 East Asbury Circle #403, Denver, CO, 80222, was listed on Schedule A with a value of $96,212, subject to a secured claim of $130,425.09. On Schedule D (creditors holding secured claims), Debtor listed America's Servicing Company as having a first mortgage on the residence in the amount of $103,563, as well as a second mortgage on the residence in the amount of $24,015.09 and the COA as having an outstanding lien in the total amount of $2,847. U.S. Bank, as assignee for America's Servicing Company, filed POC 10-1 for $109,673.32.[2] The COA filed POC 7-1 for $6,652.69. Debtor listed her COA dues on Schedule J (current expenditures) at $230 per month.

---

[1] The plan was confirmed on January 14, 2014, subject to this Court's determination of the amount of the lien due to the COA. Payments under the plan would be $114 more per month if the entire amount of the COA lien is included in the plan, which, according to Debtor's counsel, would likely result in the Debtor's inability to make payments under the plan.

[2] U.S. Bank is not attempting to collect under the second mortgage due to the lack of equity in the residence.

On July 18, 2013, Debtor filed a Motion to Determine Value of Property under 11 U.S.C. § 506 in connection with the first and second mortgages (docket #8) and a Motion for Valuation and to Bifurcate Claim under § 506(a)(1) in connection with the COA lien (docket #11). The Debtor proposed a valuation of the residence at $96,212 (less than the amount of the first mortgage), and a bifurcation of the COA lien into a super priority lien and a non-super priority lien. The Debtor requested "an order finding that the COA non-super priority [lien] . . . is wholly unsecured and that upon the completion of the debtor's chapter 13 plan, [the COA] must tender a release of its non-super priority lien, directly to the debtor, within 30 days of the order of discharge."

The COA filed an objection to confirmation of the Debtor's initial Chapter 13 plan, but did not file any response to the Debtor's § 506 motions. Debtor amended her plan on September 10, 2013, which drew another objection from the COA. In that objection, the COA stated that "subsequent to the initial Chapter 13 plan, opposing counsel sought valuation of the Debtor's primary residence and [Debtor] has amended the Chapter 13 plan." The COA withdrew its objection to the initial plan, "based on the Debtor's Amended Plan and the valuation," but objected to "stripping off" its lien. The Court then set the matter for briefing and a hearing.

II. Discussion

In its brief and at the hearing, the COA first noted that under *Nobelman v. American Sav. Bank*, 508 U.S. 324 (1993), the Bankruptcy Code prohibits a debtor from modifying the rights of a creditor who has a claim secured only by the debtor's principal residence. The COA then argued that "if any part" of a claim is secured, the entire claim, both the secured and unsecured parts, cannot be modified, citing *In re Griffey*, 335 B.R. 166 (10th Cir. BAP 2005). The COA contended that it had a statutory lien for assessments pursuant to the Colorado Common Interest Ownership Act, C.R.S. § 38-33.3-316 (the "Act"), in the amount of $6,652.69, that was partially secured and could not be modified.

In response, the Debtor asserted that under the Act, the COA had a super priority lien over U.S. Bank's otherwise senior deed of trust in the event of a foreclosure, but that the lien was limited to the delinquent assessments accruing within six months of the initiation of foreclosure proceedings, which in this case amounted to $1,380. That is the amount the Debtor proposed to pay to the COA in her amended Chapter 13 Plan. At the hearing, the Debtor argued that *Nobelman*'s anti-modification prohibition does not apply to the COA lien, where the Act has specifically limited the COA lien to six months of assessments.

2

A. Relevant statutory law

Resolving this issue requires the Court to consider the interplay of the Act with sections 506(a)(1) and 1322(b)(2) of the Bankruptcy Code. 11 U.S.C. § 506(a)(1) provides:

> § 506. Determination of secured status
>
> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 1322(b)(2) provides:

> § 1322. Contents of plan
>
> (b) Subject to subsections (a) and (c)[3] of this section, the plan may–
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

The Act provides, in relevant part, as follows:

Title 38. Property--Real and Personal
Real Property
Interests in Land
Article 33.3. Colorado Common Interest Ownership Act
Management of the Common Interest Community

§ 38-33.3-316. Lien for assessments. (1) The association, if such association is incorporated or organized as a limited liability company, has a statutory lien on a unit for any assessment levied against that unit or fines imposed against its unit owner. Unless the declaration otherwise provides, fees, charges, late charges, attorney fees, fines, and interest charged pursuant to section

---

[3] These sections are not at issue in this case.

3

38-33.3-302(1)(j), (1)(k), and (1)(l), section 38-33.3-313(6), and section 38-33.3-315(2)[4] are enforceable as assessments under this article. The amount of the lien shall include all those items set forth in this section from the time such items become due. If an assessment is payable in installments, each installment is a lien from the time it becomes due, including the due date set by any valid association's acceleration of installment obligations.

(2) (a) A lien under this section is prior to all other liens and encumbrances on a unit except:

(I) Liens and encumbrances recorded before the recordation of the declaration and, in a cooperative, liens and encumbrances which the association creates, assumes, or takes subject to;

(II) A security interest on the unit which has priority over all other security interests on the unit and which was recorded before the date on which the assessment sought to be enforced became delinquent, or, in a cooperative, a security interest encumbering only the unit owner's interest which has priority over all other security interests on the unit and which was perfected before the date on which the assessment sought to be enforced became delinquent; and

(III) Liens for real estate taxes and other governmental assessments or charges against the unit or cooperative.

(b) Subject to paragraph (d) of this subsection (2), a lien under this section is also prior to the security interests described in subparagraph (II) of paragraph (a) of this subsection (2) to the extent of:

(I) An amount equal to the common expense assessments based on a periodic budget adopted by the association under section 38-33.3-315(1) which would have become due, in the absence of any acceleration, during the six months immediately preceding institution by either the association or any party holding a lien senior to any part of the association lien created under this section of an action or a nonjudicial foreclosure either to enforce or to extinguish the lien.

(II) Deleted by Laws 1993, H.B.93-1070, § 21, eff. April 30, 1993.

(c) This subsection (2) does not affect the priority of mechanics' or materialmen's liens or the priority of liens for other assessments made by the association. A lien under this section is not subject to the provisions of part 2 of article 41 of this title or to the provisions of 15-11-202, C.R.S.

---

[4] These sections describe the types of fees that can be charged. There is no dispute over the types of fees charged under the COA lien in this case.

4

(d) The association shall have the statutory lien described in subsection (1) of this section for any assessment levied or fine imposed after June 30, 1992. Such lien shall have the priority described in this subsection (2) if the other lien or encumbrance is created after June 30, 1992.

(3) Unless the declaration otherwise provides, if two or more associations have liens for assessments created at any time on the same property, those liens have equal priority.

(4) Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessments is required.

B. Relevant Colorado case law

In *BA Mortgage, LLC v. Quail Creek Condo. Ass'n*, 192 P.3d 447 (Colo. Ct. App. 2008), the Colorado Court of Appeals addressed the priority of encumbrances under the Act. In that case, the condominium association recorded its declaration in 1979. The owners purchased a condo unit and encumbered it with a first deed of trust in 1997. The association filed two assessment liens in May 2001, and the lender instituted a foreclosure in June 2001. The unit was sold to HUD, and in April 2002 the association recorded a restatement of its liens stating that the liens were still an encumbrance on the property. The lender then sued the association for slander of title.

The court held that under the plain language of the Act, the lender's deed of trust was senior to the association's assessment lien, except for those assessments accruing within six months prior to the commencement of the lender's foreclosure proceedings. The court also held that the association's lien included interest, charges, late charges, fines and attorney fees so long as the total does not exceed the limit, citing *First Atl. Mortgage, LLC v. Sunstone N. Homeowners Ass'n*, 121 P.3d 254, 255 (Colo. Ct. App. 2005). The court noted that the purpose of the Act was to "provide stability to the finances of common interest communities by granting them a super-lien for unpaid assessments, and to provide uniformity and predictability to lenders in order to promote the availability of financing." *BA Mortgage* at 450.

In this case, the COA submitted its Declarations as Exhibit B for the hearing. The Declarations were recorded on April 30, 2004. U.S. Bank recorded its first deed of trust on February 28, 2006, and instituted a foreclosure on April 27, 2012. Applying *BA Mortgage* to this case, the Court determines that U.S. Bank's first deed of trust is senior to the COA lien, except for those assessments that would have become due during the six months preceding the institution of U.S. Bank's foreclosure proceedings.[5] Thus, U.S. Bank has a lien against the

---

[5] Section 506 would be available to Debtor and operate on the COA's secured claim, whether or not U.S. Bank had instituted foreclosure proceedings prior to the filing of Debtor's case. The strip-off provisions of § 506 mimic the effect of a state court foreclosure proceeding.

residence for $109,673.32, subject to a carve-out for the assessments accruing within the six months prior to U.S. Bank's foreclosure proceeding on April 27, 2012. The parties agree that this carve-out amount is no more than $1,380.[6]

### C. Application of the Bankruptcy Code

Where the parties disagree is the effect of § 506(a)(1) and § 1322(b)(2) on the COA lien. The COA argues that its lien is partially secured; in other words, the mandatory six months of assessments given super priority (in the amount of $1,380) creates a secured interest in the residence under the language of 506(a)(1), which provides, in part: "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." It follows, the COA reasons, that because its lien is partially secured, the total amount of its lien (in the amount of $6,652.69) cannot be modified under § 1322(b)(2), which provides, in part: "the plan may . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."

To support this argument, the COA cites to *Nobelman*, 508 U.S. at 324, and *Griffey*, 335 B.R. at 166, stating that "[t]he *Griffey* Court recognized Justice Thomas's holding that *Nobelman* could strip an unsecured claim, because the Bank's claim was wholly unsecured, and the antimodification clause did not apply. The *Griffey* Court also understood if any part of the Bank's claim is secured, then, under Justice Thomas's interpretation of the term 'claim,' the entire claim, both the secured and the unsecured parts, cannot be modified." The COA thus concludes that because its lien is partially secured, the entire amount of its lien cannot be modified in the Debtor's Chapter 13 plan.

The Debtor, on the other hand, contends that the COA lien may be bifurcated into two liens: (1) the super priority lien for $1,380, which is first in time as to all consensual liens; and (2) the "covenant which runs with the land," for the remaining amount ($5,272.69), which is inferior to all other consensual liens, and which is "wholly unsecured." The Debtor then cites *Griffey* for the proposition that the anti-modification clause discussed in *Nobelman* does not "protect a junior lien holder whose claim is wholly unsecured by any equity in a debtor's primary residence." Thus, Debtor reasons, the non-super priority COA lien ($5,272.69) will share in Class IV unsecured creditor distributions if a timely proof of claim is filed and allowed.

---

[6] At the end of the hearing, counsel for the COA stated that he believed the amount was actually $1,342. POC 7-1 shows that the monthly maintenance fee was $226, rather than the $230 that Debtor listed on her schedules. Multiplying the $226 by six months equals $1,356.

Because the COA did not contest the Debtor's § 506 motion, it is undisputed that the value of the residence is $96,212; thus, there is no equity in the residence given the amount of the first mortgage held by U.S. Bank. The parties disagree, however, as to whether the COA lien is "wholly unsecured" or "partially secured," as those terms are defined in the Bankruptcy Code and relevant case law. Because both parties cite the *Griffey* case to support their opposing arguments, the Court will start with that case.

In *Griffey*, the Tenth Circuit Bankruptcy Appellate Panel ("BAP") identified the issue as "[w]hether 11 U.S.C. § 1322(b)(2) permits Chapter 13 debtors to remove a creditor's lien attached to the debtors' homestead where the creditor's claim is wholly unsecured as defined by 11 U.S.C. § 506(a)." *Griffey*, 335 B.R. at 167. The BAP then analyzed the language of § 1322(b)(2), noting that " [t]his provision is often referred to as the antimodification clause, and '[p]ut more directly, [it] bars a debtor from modifying the rights of a creditor who has a claim secured only by the debtor's principal residence.'" *Id.* at 167-68 (Citations omitted). The BAP then stated that "the decision in *Nobelman* . . . stands for the proposition that the antimodification clause of § 1322(b)(2) bars Chapter 13 debtors from stripping down a creditor's claim when any portion of that claim is secured by the debtors' home." *Id.* at 168-69. However, the BAP held that *Nobelman* did not apply in the case before it, reasoning as follows:

> While the antimodification clause uses the term "claim" rather than "secured claim" and therefore applies to both the secured and unsecured part of a mortgage, the antimodification clause still states that the claim must be "secured only by a *security interest in* . . . the debtor's principal residence." 11 U.S.C. § 1322(b)(2) (emphasis added). If a mortgage holder's claim is wholly unsecured, then after the valuation that Justice Thomas said that debtors could seek under § 506(a), the bank is not in any respect a holder of a claim secured by the debtor's residence. The bank simply has an unsecured claim and the antimodification clause does not apply.[7]

*Id.* at 169.

Additionally, the BAP cited with approval the Fifth Circuit case of *In re Bartee*, 212 F.3d 277 (5th Cir. 2000), where that court explained:

> Given the express instruction [in *Nobelman*] to visit § 506(a) first, it is no wonder the majority of courts hold to the same reasoning put forward by Debtor. If it is correct to "look[ ] to § 506(a) for a judicial valuation of the collateral to

---

[7] The BAP did recognize that "if any part of the bank's claim is secured, then, under Justice Thomas's interpretation of the term "claim," the entire claim, both secured and unsecured parts, cannot be modified." However, the BAP noted that in *Nobelman*, Justice Thomas's determination that the bank held a secured claim was based on the lien's having support by some collateral value in the home. *Griffey* at 169.

7

> determine the status of the bank's secured claim," then it stands to reason that valuation will control the determination of the mortgagee's security interest—i.e., whether it is a secured or unsecured claim. "Once we accept that courts must apply § 506(a), then it follows, even under *Nobelman*, that a wholly unsecured mortgage holder does not have a secured claim." In the case of a wholly undersecured junior mortgage, the valuation function of § 506(a) obviates the need to even consult §1322(b)(2). After all, Justice Thomas's determination that the creditor bank held a secured claim rested upon the fact that the lien was supported by at least some collateral value in the home. Unlike the bank in *Nobelman*, which held both a secured claim and an unsecured claim,[the creditor] holds only an unsecured claim. Without an allowed secured claim, a creditor cannot invoke § 1322(b)(2).

*Griffey* at 169 *(citing In re Bartee*, 212 F.3d at 290)(internal citations omitted).

In *Griffey* the BAP ultimately held that the antimodification clause of § 1322(b)(2) does not apply to the holder of a wholly unsecured claim, as such is defined by 506(a).

At the hearing in the instant case, both parties recognized that the *Nobelman* and *Griffey* decisions specifically dealt with stripping off second mortgages, and did not address the issue of stripping off a lien such as the COA lien. The COA's argument that part of its lien is secured by the terms of the Act itself is a novel one, but is misplaced. The COA did not cite any case law interpreting the Act, or the Act's counterparts in other jurisdictions. The Debtor cited to two Colorado state court cases dealing with the Act, but neither addressed the issue presented in this bankruptcy case. The Court's analysis is thus based on its own research, since this issue appears to be one of first impression in this Court.

At the outset, the Court notes that the plain language of the anti-modification clause of § 1322(b) uses the term "security interest." The term "security interest" is defined in Bankruptcy Code § 101(51) as a lien "created by agreement." Based on this, some courts have found that any lien to which the debtor did not consent—meaning statutory and judgment liens—can be modified even if attached to the debtor's principal residence. *See In re McDonough*, 166 B.R. 9,13 (Bankr. D. Mass. 1994) (judgment lien); *Rankin v. DeSarno*, 89 F.3d 1123, 1127 (3rd Cir. 1996) (tax lien); and *In re Seel*, 22 B.R. 692 (Bankr. D. Kan. 1982) (mechanic's lien). In *Seel*, the Kansas bankruptcy court stated that "a 'security interest' is defined as a lien created by an agreement . . ..This should be compared to a 'statutory lien,' defined as a lien arising solely by force of a statute or specified circumstances or conditions, . . . but does not include security interest . . . whether or not such interest . . . is provided for by or is dependent on a statute . . .." *Id.* at 695. A condominium association lien is generally recognized as a statutory lien, *see, e.g., Young v. 1200 Buena Vista Condo.*, 477 B.R. 594 (W.D. Penn. 2012).

The Act itself refers to the lien at issue here as a statutory lien. Further, the Act defines "security interest" as an "interest in real estate or personal property created by contract or conveyance which secures payment or performance of an obligation, including a lien created by

a mortgage, deed of trust . . . and any other consensual lien . . . intended as security for an obligation." *BA Mortgage* at 450 (citing Colo. Rev. Stat. § 38-33.3-103(28)). Thus, it appears that the COA lien is not a security interest, either as defined in the Bankruptcy Code or in the Act. The Court also examined the language of the COA Declaration, admitted as Exhibit B. The Declaration's Recitals state: "Declarant desires to create a condominium common interest community pursuant to the Colorado Common Interest Ownership Act . . . (the "Act.") (Recitals, Section B, page 6). The COA Declaration further provides: "Additionally, Declarant hereby submits the Property to the provisions of the Act." (Article 1, Section 1.1)

Because the COA lien is not a security interest as defined in the Code, the Act, or the language of the COA Declaration,[8] the Court holds that the antimodification clause of 1322(b)(2) does not apply. Thus, the COA lien is a statutory lien that may be modified in a Chapter 13 plan. Pursuant to § 506(a)(1), the COA lien may be bifurcated into secured and unsecured portions based on the valuation of the residence. The result is that a portion of the lien, supported only by the unsecured claim, is void, while a portion of the lien, supported by a secured claim, remains in place. *See* 11 U.S.C. § 506(d) ("To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."). Therefore, in this case, only the super priority portion of the COA lien is supported by value to which its lien may attach. The remainder of the COA lien is void under § 506(d) upon completion of the plan.

At the hearing, both parties addressed whether the COA lien "runs with the land," under applicable state law. The term "runs with the land" is a term of art that is generally used in real property law in connection with discussions of covenants and servitudes. To the extent that the parties use the term here to denote the fact that, in normal operation, the unsatisfied statutory lien for unpaid assessments is enforceable against the property in the hands of a transferee, in that sense, the COA's lien can be said to "run with the land." But the fact that an unsatisfied lien in favor of a property owners association may continue to be enforced against the property after a transfer does not distinguish the COA's statutory lien from any other type of lien. For example, an unsatisfied mortgage is enforceable against the encumbered property in the hands of a transferee. RESTATEMENT (THIRD) OF PROPERTY § 5.2(a). Claims based on mortgages are routinely analyzed under § 506(a) and such liens are routinely avoided under § 506(d). There is nothing in § 506 that provides a basis to exclude the COA's statutory lien from the operation of the Bankruptcy Code. The fact that the COA's unsatisfied statutory lien continues to be enforceable against a subsequent transferee, just like other liens, does not insulate it from being subjected to bifurcation under § 506(a) and avoidance under § 506(d).

Finally, the fact that a portion of the COA's prepetition lien may be avoided under § 506(d) does not affect the fact that its covenants – as distinct from its statutory liens – do "run with the land." As a consequence, the Debtor's obligation to pay postpetition assessments

---

[8] Even if some language in the Declaration attempted to make the COA lien a "security interest," generally when such language conflicts with the applicable statutory language, the statutory language controls. *See BA Mortgage* at 450.

continues and postpetition liens that arise with respect to unpaid assessments are unaffected by this Order. In the case of *In re Plummer*, 484 B.R. 882 (Bankr. M.D. Fla. 2013) the court stated:

> [T]he court concludes that a condominium association lien encumbering the debtor's principal residence can be stripped off in a chapter 13 case where the amount of the first mortgage exceeds the value of the condominium. Of course, the power to strip off liens is limited to liens existing on the date of the petition. It does nothing to insulate a debtor who is a unit owner for liability for assessments that come due after the date of the petition that would otherwise be owed under Florida Statute 718.116(1)(a).

*Id*. at 890.[9] *See also In re Foster*, 435 B.R. 650 (9th Cir. BAP 2010) (holding that, where debtor remained in the home, the requirement to pay homeowners' association dues was a covenant running with the land, and so debtor's personal liability for post-petition dues was an incidence of property ownership unaffected by the filing of the bankruptcy petition). Such cases are consistent with the Section (1) of the Act, providing that "each installment is a lien from the time it becomes due...".

III. Conclusion

The Court's conclusion is supported by the plain language of the Act. When a statute's language is plain, the sole function of the courts is to enforce it according to its terms. *In re Woods*, 743 F.3d 689, 694 (10th Cir. 2014). The Act provides that the COA's lien for unpaid assessments is prior to all other liens except a first mortgage and taxes, that each unpaid assessment becomes a lien on the property from the time it is due, and that the COA holds a senior lien not to exceed six months of assessments in the event of an action to enforce or extinguish its lien. Finally, being a statutory lien, the Court has concluded that the COA's secured, non-senior claim is subject to the operation of 11 U.S.C. § 506.

---

[9] Florida's condominium statutory scheme is similar, but not identical, to Colorado's. *See generally* Andrea J. Boyack, Community Collateral Damage: A Question of Priorities, 43 Loy. U. Chi. L.J. 53, 100 (Fall 2011) (addressing the Uniform Common Interest Ownership Act, or "UCIOA," and noting that while Colorado is a "UCIOA state," Florida has given community association liens some limited priority without adopting the UCIOA in its entirety ).

For all the foregoing reasons, it is

**ORDERED** that the COA's Amended Objection to Amended Chapter 13 Plan (docket #29) is DENIED. It is further

**ORDERED** that, under 11 U.S.C. § 506(a), the COA holds an allowed secured claim in the amount of $1,356[10] secured by a lien on the Debtor's residence at 4600 East Asbury Circle #403, Denver, CO 80222. In addition, the COA has an allowed unsecured claim of $5,296.69 (the claim total of $6,652.69 less the $1,356.00 secured portion). Under 11 U.S.C. § 506(d) the unsecured portion of the COA's lien shall be void upon completion of payments under the Debtor's Plan. Upon successful completion of the Debtor's Plan, the Debtor may request an order that the lien is extinguished. If the bankruptcy case is dismissed or converted to a case under chapter 7, this Order shall be deemed vacated and the lien shall be reinstated and shall continue in full force and effect as specifically provided by 11 U.S.C. §§ 348(f)(1)(B) and (C) and 349(b)(1)(C).

Dated this 1st day of July, 2014.

BY THE COURT:

*Howard Tallman*

Howard R. Tallman, Chief Judge
United States Bankruptcy Court

---

[10] As previously noted, POC 7-1 shows that the monthly maintenance fee was $226. Multiplying the $226 by six months equals $1,356.

11